All right, we will move on to our second case for this morning, St. Anthony Hospital against Theresa Eagleson and we'll hear first from Mr. Feldman. Thank you and before I start can the court hear me? Yes, thank you. Great, thank you. May it please the court. This appeal is mainly about two federal rights, right to first, can a safety net community hospital sue the state to enforce the federal right to get paid Medicaid funds on the specific 30-90 day timeline set forth in the statute? Second. So, Mr. Feldman, I hate to jump right in, but is it your argument that that time schedule is needed to be in the contract between the state and the MCOs and was not or that it is in the contract and they're just not enforcing it or that the contract provides an alternative schedule for payment and they're not enforcing that? A and B. It needed to be in the contract. It is in the contract. It is in the contract. Okay, that matches. It is in the state MCO contract. All right. So can I ask, this is a little bit out of left field, but these contracts are annual, right? I mean, if, or the contracts between St. Anthony and the MCOs are annual contracts, subject to termination, of course, but why couldn't St. Anthony, for example, if it thought that the remittances were not providing enough breakdown of information, why couldn't St. Anthony just take care of that in a contract renewal? I don't know the answer to that and there's nothing in the record on that. I believe that, and as the MCO said in their brief, this is a standard industry contract. I don't believe that there's much room for negotiation on terms like that. And I think we know from the record because when the issue was raised at the biweekly meetings that HFS convened with the MCOs and the providers to talk about general problems and St. Anthony and other hospitals raised this transparency problem in those meetings, both in early 2020 and again in July, 2020, the MCOs objected to making any change and HFS refused to do anything about it. So the answer is pretty clear that even if asked, it wouldn't happen. And St. Anthony really has no choice because it is a community hospital in Little Village. Its population is almost entirely Medicaid patients. And so it really has to deal with the MCOs on this and on other issues. And the second general issue I was going to mention is the one we were just talking about, and that is whether hospitals have a due process right to get notice of basic information to determine whether it's getting paid the amount the law requires. Now this, are you raising this in conjunction with your effort to supplement or perhaps amend whatever it was, you called it a motion to supplement the complaint, or are you raising this in some other, saying that the due process argument was implicit in your original complaint? Both. It's stated expressly as a due process claim in the proposed count three, carrying forward this court's opinion in the Vargas case from the 1970s. It's implicit in the statute in U2F because Congress wanted providers to be paid promptly on the schedule, but that would be a hollow right. Congress surely was not intended that providers not get paid the amount. And so implicit in getting prompt payment is information to determine whether the promptly paid amount is the right amount. It doesn't do a provider any good to get paid less, to pay promptly but not get paid what the provider is entitled to be paid. So Mr. Feldman, what facts were essential to the due process clause claim that you did not learn until after the original complaint was filed? So the original complaint did have many of the facts that undergird the due process claim. The additional facts that are set forth in the supplement concerned events that happened after the filing of the complaint, including occurrences that happened in July of 2020 with the adoption of phase two of the HAP program, hospital system payment program, and renewed requests by the hospital to HFS to cause the MCOs to provide transparent remittances. Those facts occurred afterward. So we were faced with a choice when we drafted the complaint. Do you call it an amended complaint or do you call it a supplemental complaint? I get the point about new facts, but what I keep thinking reading this whole thing is that this is a distraction because people are not required to plead legal theories. You know, there's a legal, you know, the underlying facts are what they are. St. Anthony's is saying it's not getting paid the correct amounts of money under all these different aspects of the Medicaid program. The state is saying we put everything we were supposed to in the contract with the MCOs. If you've got a problem at all, it's between yourselves and the MCOs. And the legal theory is just that. I mean, it's just why might that be wrong? And so it seems to me a little bit beside the point. I agree with that, Judge. It's really, and that's why the amendment should have been granted. Regardless, even if every fact that supports the claim could have been pleaded at the outset of the case, that happens in vast majority of cases where there are amendments. You file a complaint, you have counts one, two, three, whatever counts you have. You live with the complaint a while here. There was a motion to dismiss pending while it was pending. We added this additional theory, legal theory to the that happens all the time in litigation. And that's exactly why we were so surprised when we got the ruling denying leave, particularly after the judge, when presented with the motion, entered an order saying, I don't want to do the agreed briefing schedule. I don't want to reply. And this leave shall be freely granted under the rule. And the state, I know the plaintiffs agreed to give you 28 days to respond, but I want a response in nine days. And I don't want to hear from the plaintiffs about this because leave shall be freely granted. And this, this in my 38 years of practice is I've never seen anything, anything like this where the case is motion is filed when the case is only nine months old. Discovery is in its infancy. There's a motion to dismiss pending. There's no answer. There's no prejudice to anybody. Uh, and the court, uh, decides denies it on the basis and basis that we were really not given an opportunity to address. It really runs squarely into the, uh, uh, the running, uh, case in running and the motion that Smith had already been denied when the leave to amend request to leave to amend what's filed here. The motion was then denied the leaves, uh, to amend on the theory that somehow this was expanding the case. And that was, uh, if there was ever a case, uh, uh, in which there was an abuse of discretion, uh, regarding amendments, this is such a case. Let me ask you something else. I mean, the thing that really bothers me about your theory isn't whether generically you can have a private right of has never overruled the blessing formulation. It's sharpened it a bit in Gonzaga. So I'm fine with that as an abstract proposition of law. But when we look at the statutes that you're relying on, um, you need to talk about, at least for me, uh, why St. Anthony, why a provider such as a hospital, not just some mom and pop doctor's office, why a provider such as a hospital is that kind of intended beneficiary? And what obligation is it that you think, um, the state of Illinois isn't conducting? Because it seems to me, and the state argues this in its brief, that you envision some huge auditing apparatus where the state micromanages every single claim that's submitted to make sure it got paid within this 30, 90 day period, whichever is the applicable one. And that, the whole point of the MCO structure was to relieve the state of those burdens. The state makes it clear to the MCOs what they're supposed to do. And then the MCOs, if they do it, great. If they don't, you can arbitrate with them. Respectfully, the state's argument about micromanaging and, uh, uh, having to, uh, uh, basically review every claim, uh, et cetera, uh, respectfully, that is a pretty, uh, red herring that the state has offered. That is not, that is not, uh, our claim and that's not what we're asking. So, so can I ask you just as a follow-up? Um, I wasn't sure about this until I got to your reply brief. Um, are you, is your client accepting for the purpose of this litigation that a clean claim is only a claim that the MCOs pay, um, once they're satisfied with, you know, whatever they, they need? In other words, you're not, well, are you accepting, uh, the MCOs determination what's clean? Um, so two, two responses to that. First, in terms of the definition of clean claim, that is, uh, defined in, uh, in, in, in regulations. And it's, it's essentially a claim in which, uh, no further documentation is requested to be adjudicated and paid. Right. But at one point you say... There's the definition and I'm sorry. At one point you say, um, that the MCOs know when the claim was received, whether it was clean initially because they paid it without asking for information or later and when it was paid. In other words, once the MCO has finally settled on it being clean, they can easily report that data to the state and, you know, people can monitor that. But that sounds to me like you are willing to accept the MCOs determination, which would get rid of one of the arguments the state makes against you, which is what, you know, how many claims are likely to be disputed, probably a certain number of them. We are willing to accept that in the, in the sense that if you, if you go down that path and you only look at what the MCOs themselves have determined to be clean claims, they're still not hitting the prompt payment mandate. We do have disagreements over whether they are correctly determining clean or not, but you don't have to get there in order to rule in our, in our favor. Our claim passes muster without having to decide that, that other question. And part of the problem, this gets to the earlier question about what the state should be doing and not, and we're not saying they have to review every claim, but they are gathering data about how fast MCOs are paying claims in the aggregate. They are gathering that, but they're gathering the wrong information. They're not even tracking whether or not the MCOs are meeting the statutory mandate because they're tracking how, how long it takes the MCOs after they adjudicate a claim, not from when the claim is submitted to them. So they're starting too late on the timeline for measuring a clean claim. A clean claim is measured from when it's submitted by the hospital to the MCO, not from when they get around to looking at it and adjudicating it and then paying it. But it can take a while to figure out. I mean, with these complex Medicaid codes, I mean, adjudicating a claim isn't quite as easy all the time as you're making it out to be. I'm not, I'm not saying it is, but what they're measuring, but still the statutory mandate counts from when you, the claim is submitted, not from when it's adjudicated. So they're starting the clock too late on the timeline. And even then the data that HFS got, the MCOs were not meeting, meeting the standard, even when given a head start by starting the clock too late. If I could ask you, I guess what concerns me most about this case is if I were a district judge and this hit my docket, I'd think, wow, there are some forms of relief that might be just clearly out of bounds. I don't want to take over the state's Medicaid program as a sitting district judge. And I've got, I've got a plaintiff who has, at least in theory, contractual remedies available to it under the arbitration clauses. Why can't the state and why can't the district court say, in essence, to your client, at least give the existing structure of remedies a try with the arbitration before we step in with this kind of bank shot with remedies directed at the state in order to get the MCOs to comply with the contract? I think the answer is that the arbitration remedy, which only applies to three of these four intervenors, county care does not have a mandatory arbitration clause and they are the payment issue. But the answer beyond that is the arbitration remedy is not an exclusive remedy to solve the problem. This is a systemic problem going across the board for all of the MCOs. And the best way in our view to fix it was, and it's a, it's an obligation of the state under the federal statute to ensure that this procedures are in place, that payments are made on time. And so we thought the best way to solve the problem and not have four different arbitrators or three different arbitrators possibly reaching different and conflicting conclusions in atomized proceedings, the most direct way to solve the problem was to seek enforcement under the statute. And in terms of Medicaid generally, in each of these cases in which rights of action have been upheld, it did involve federal courts involved in some aspect of what everybody agrees is a somewhat Byzantine federal program. And I think that's a question directed more to the remedial phase and what is within the competence and appropriate purview of a federal court here with a 30, 90 day timeline. That's a very narrow and specific prescription that doesn't require a lot of guesswork about what it means. And on the issue of notice and notice for this context or that context, I see that my time is up. Yeah, okay. I will see if I can give you a little extra, but we'll stop for right now. Thank you. Thank you. We will now turn to another name I can't pronounce. Mr. Huzzack? How do you pronounce? Huzzack. Richard Huzzack. Pleased to be here. May it please the court, the council. I'm Assistant Attorney General Richard Huzzack, counsel for the defendant Daphne Theresa Eagleson, Director of the Illinois Department of Healthcare and Family Services or HFS. And I urge the court to affirm both rulings by the district court, dismissing the complaint for failure to state a claim and also denying leave to file a supplemental complaint, adding the new due process theory and expanding the scope of the case beyond the timeliness of payments into the details in remittances, not only by MCOs, but also by HFS under its separate fee-for-service program that had never been a part of the case. So, I do want to make one... Wait, wait, Mr. Huzzack. Judge Hamilton has a question. All right. Please. On that point, if St. Anthony's filed a new separate action tomorrow with what is now count three, would the state be willing to waive now any defenses based on the district court's decisions in this case, such as claim or issue preclusion? I would have to, as I stand here now, I can't make that representation. I can certainly consult with the client, but I don't think that such a waiver would be necessary under the law because... I do. I actually have to say, that just screamed claim preclusion to me because it's based on the same underlying facts. They raised it for the first time in their reply brief, so I think it would be helpful for me to just articulate why I think they're wrong, and I would rely upon this court's decisions in the DNK properties case, the United States versus outboard marine case, the matter of energy co-op case, all of which follow the restatement of judgment section 26.1b, which is discussed at length in Wright and Miller at section 44.13. And it says that although a district court generally does not have the power to define the scope of the preclusive effect of its judgment... It may, in limited circumstances, say, I'm not deciding this issue, you get to file it another day, and that will be honored as a matter of raised judicata doctrine because... But the first court, the proposition you first said is the key one. The first court cannot and does not bind the second court in its evaluation of whether either claim or issue preclusion took place. I would urge the court to examine carefully the decisions, this court's precedent in DNK properties. I can provide a supplemental memorandum on that. You don't need to do that. If the court wants me to go back and consult with our client about whether we'd be willing to waive the raised judicata issue, I'd be glad to do that. Our position is they're free to file it, as Judge Seeger said, in a new action. But Judge Seeger didn't consider any of these things, and they did properly say, look, that's cold comfort because it all arises out of the same... They didn't say that to him. He made it clear in the fifth page of his order that they could file it in a new action, not in this action. And under the restatement principles that this court has followed, that should be honored. Otherwise, every motion to amend puts the court at the dilemma of saying either somebody can bring it in this case or they can never bring it. And the middle ground is the fair one. That's why I asked you whether you would be willing to forego such defenses, and you have not said yes. So when do we proceed with... Yeah, and I can get back to the court with a response to that specific question if the court would be willing to entertain such a submission. I would need to consult if that's acceptable. You may submit a letter to that saying whatever it is you say. I appreciate that, Your Honors. So I think really the threshold issue here, though, and I want to dispute the suggestion that there's been some type of indifference by the defendant or worse with respect to the timeliness of MCO payments to safety net hospitals that are providing much needed medical services to the neediest members of our society. We just want to say that just isn't true. We accept for purposes of the 12B6 motion the truth of the well-pled factual allegations, but we want to make clear of record that that is just over the top. That's beyond exaggeration. It just isn't true. What do we do with the testimony about this all being, quote, provider noise? No, I think that's a complicated issue with respect to the remittances because it involves difficult software programming issues where the providers are national organizations that have their means for providing remittances, all of which is in conformity with federal law. And St. Anthony says, well, we don't like that. And although the evidence in this case shows they have all the information they need to figure out whether they're getting paid what they're owed. I thought they contested that, actually. I understood the reference to provider noise to be discussions within HFS about the kinds of issues that St. Anthony is raising here. I have some experience in state government with Medicaid some years ago, and I know that reimbursement rates, that doesn't mean they're always wrong and that they aren't important. You're saying there was no indifference. I'm troubled by an HFS official describing St. Anthony's complaints here as part of the provider noise. It's hard for me to interpret that out of context. You know, I'm dealing with a motion to dismiss a complaint that has a lot of allegations, which we have not been able to test in evidence. Some of those allegations proved to be wrong and limited discovery, and the allegations about the transparency are demonstrably wrong, as established by the declaration submitted in document 106-1 in response to their motion to leave to file a supplemental complaint. They use the county care situation as an example of why the court needs to step in and create a private right of all providers, not just if there's a systemic problem, but every provider, if they're not paid on time by an MCO, would have a right to go into federal court and use this, as Judge Hamilton said, backshot method to force the federal court, to force the state, to force the MCO to pay the provider on time when there's a direct remedy under the contract. Well, wait a minute. The problem with doing this at retail, every patient of St. Anthony's over the course of a year, that's administratively ridiculous, I have to say. I mean, that would be an awful lot of arbitrations. My question for you is, if you look at 1396, these are all horrible citations, 1396A, Peren A, Peren 37, capital A, which says the state plan for medical assistance must provide for claims payment procedures. It doesn't stop there. It's not enough to put a procedural apparatus in the plan. The procedures have to ensure, which is a pretty strong word, that this 90%, 30 days and all the rest of it, those goals are met. All of that is true. All of that's true under the fee-for-service program, but that's not the MCO managed care program. They abandoned their plan. Their first theory was under that statute, but they abandoned that because this court held in Illinois Council on Long-Term Care that it doesn't require hospitals to be paid under the 30-day, 90-day schedule, and it also doesn't apply to managed care programs at all. They've admitted that in their reply group. The problem is that under a managed care program- So you're looking at 1396U2F? That's the major statute that they rely on on appeal. They've abandoned their claim under A37A. But there are references to AA37A in U2F, so it doesn't just disappear. That's why I looked at it. Yes, there is, but I think the court has to carefully look at the language of U2F to figure out what that reference means. It's describing a contractual provision that has to be put into a state's contract with an MCO and describes the MCO's contractual duty to pay providers on a timely basis, consistent with the claims payment procedures in Section A37A, unless the provider and MCO agree otherwise. Well, but why do you read the state plan reference out? I mean, it just refers to the section. It says the contract has to, you know, arrange for payment, use the procedures from AA37A, unless some different set of procedures, which I gather is not involved in this case. It's just the, I think, the 37AA37A. What it's saying is that the MCOs have to pay the providers according to that schedule, unless the provider and MCO agree otherwise. Right, and A, the providers have a very strong interest in that, just to put that marker down, and B, this all flows from the state plan. So if there's a generic problem with the state plan, why not solve it at that level? I don't understand the question. If the state plan doesn't, I mean, it sounds to me like you're arguing they could wait 10 years to pay, that there are no limits, you know, that they've got, you know, anything goes. I think the dispute here is whether Congress intended a contractual model for the providers to have contract rights against the MCOs and for the state to have contract rights against the MCOs, which the state implemented and enforced in the county care situation. So there are those contract rights under the contractual model, but St. Anthony argues that there is also, in addition, a statutory duty that the state has to ensure that MCOs always pay the providers on time, and the statute doesn't say that. As the district court said, it doesn't say anything like that. Excuse me, Mr. Huzzag, if I could ask you about that. I understand your point, I think, about the contractual model here, but we've got a complaint that tells us that that is just a complete failure, systemically, at least as far as St. Anthony's concerned and perhaps for many other providers as well. The statute, you seem to be reading the statute as indicating that Congress is really only with what the paper says, what the contract says, regardless of whether the contracts are actually enforceable and being complied with as a practical matter. I am. In all honesty, yes, I am. I'm thinking that, I'm saying that Congress intended to create a contractual model where states could enforce this right against MCOs and providers could enforce their rights against MCOs. But not every provider could go to federal court. Excuse me. And then hands off as far as seeing about actual enforceability and compliance. Well, the states have a right to enforce that provision. They don't have a duty to enforce that provision. St. Anthony says that this obligation, they allege, tolerates no deviation from the payment schedule, which means that the minute any MCO has one foot fault, that any provider, not just for systemic problems, for any provider can go to federal court and have the federal court force the state, force the MCO to have the provider paid on time. And that's just not what the managed care model anticipates. Let me go back to our court's language in the OB against Norwood case here. And I mean, you can certainly paint scenarios here where remedial measures would be absolutely over the top and worse than the status quo. I get that. But we said in Norwood, as I recall correctly, in essence, the state has to do something. And we can leave to capable council and district courts the task of trying to figure out an actual practical solution rather than just parading horribles on either side that would be completely unacceptable and unreasonable. And may I answer? I see my time is up, but I'd like to answer the question if I may. St. Anthony alleges that HFS confuses duties and remedies. I think the shoe is on the other foot. The question here is not what the remedy is if there's a violation of this duty. I mean, there's no allegation that we failed to put this into our contracts. And in fact, the record shows that we have enforced that provision in our contracts. But the question is whether this statute creates a duty on states always to ensure that MCOs comply with their contractual obligation. And a right to enforce it is not a duty to enforce it. Congress knows how to craft a duty when it wants to. It did not do so here. Saying that this statute unambiguously creates a duty would violate federalism principles. It can't create a private right under Section 1983 analysis because it's not an unmistakably clear duty creating a private right. It's choosing isolated words and putting stringing them together almost like in a game of hopscotch to reach an ultimate result. But the duty is to include this in the contract. The duty is not to ensure that MCOs always enforce that. And then if there's a violation of this duty, there's a remedy. But our point is that there is no duty at the threshold on this. The statute can't reasonably be read to establish that. So are we taking from your argument then that you continue to contest the first blessing factor on the use of rights language? Because I understand you to be arguing states have a right to enforce the provision, but not a duty. Are you admitting that the first blessing factor has been satisfied? Or are you disputing that? And then, of course, that's a different argument than on the 12B-6 on the motion to dismiss. I think the answer is, and I need to clarify, we agree that the statute imposes a duty. We dispute what the duty is. What is the obligation is the question, actually, which sounds a lot more like blessing factor three to me than one. And the district court said the duty that St. Anthony alleges is not in the statute at all. They're reading it into the statute, but that's not the proper function of the courts here. So we agree that there's a duty. We agree that it's mandatory. But we don't agree that the ultimate beneficiaries of the duty that St. Anthony alleges that we the benefit of providers. We think that there are means by which Congress has attempted, if you accept their theory of the duty, which we dispute, is the means by which Congress has intended to make sure that there is a provision of health care services to individual beneficiaries of the program who are the participants getting medical care. So we do not think that providers are the individual rights beneficiaries of the statute, even if you accept the duty that St. Anthony alleges. But we most vehemently dispute that that duty exists at all under a permissible reading of the statute. Mr. Hussag, just one other thing I'd like to address with you. As you know, the plaintiffs are very critical of the state's efforts to monitor and publish information on MCO performance. Do we have available, does the public have available, in essence, the state cash going the amounts of state cash going to these MCOs under the Illinois Medicaid program and the amount of cash they are actually paying out to providers? Cash in, cash out. We know where the incentives are. We have been tracking up to now, and it has been available as a matter of public records that can be obtained. The aging of payables by MCOs across broad spectrums of providers. Illinois is also- But maybe can I just ask, what I think Judge Hamilton is asking, is if, just to take some hypothetical numbers, if the state of Illinois pays an MCO a million dollars, how much of that million dollars filters out to the providers? Is it $500,000? Is it $900,000? In other words, how is the system, do you keep that data? It is subject to medical loss ratios, which is similar to what the Affordable Care Act does, to ensure that the vast majority of the money that goes in capitation payments to the MCOs is used to pay for actual medical services to patients. We understand that's the goal. Is that being reported? No, there's a statute. Is that being reported on a cash in, cash out basis? I know that the state tracks the medical loss ratios. I have not investigated to determine what the records are that show those and to what extent that those are available to the public, as opposed to HFS, just in terms of monitoring this to make sure that the MCOs are complying with those statutes and those provisions of their contracts. And I, if I may add, Illinois is now in a beta mode of a first in the nation dashboard system that will show exactly what MCOs aging of payables is and how quickly the providers are submitting their claims. One thing we know from this preliminary feature is that St. Anthony is woefully late in submitting its claims, which is one of the reasons that it's not getting paid as fast as it should. They do a great service as a hospital to needy patients, but their back office administration leaves something to be desired. Okay. I think maybe we need to wrap up at this point because we're way over time. Accordingly, I urge the court to affirm the district court's decision and I thank you, Your Honors. All right. Thank you. And Mr. Whitmer, you were going to address us. Thank you, Your Honors. May it please the court. I think it was already said today that, you know, the whole point of the MCO system is to shift the details away from the state and to the MCOs. And that makes a lot of sense from the MCOs perspective because adjudicating claims, as you can imagine, is incredibly complicated. And given, as we've already discussed, that plaintiff does, in fact, have contractual remedies available in the arbitration venue, it absolutely makes sense to give the arbitration an opportunity to apply, as we've discussed. So what do we do with the one arbitration that was sought and then one of the MCOs in question then just failed to comply with the procedures? Yeah. Well, actually, what happened there was that the arbitrator ordered that the parties try to work out, negotiate, and resolve disputes. That was the order that came down from the arbitrator. And then the MCO reached out to St. Anthony and St. Anthony is saying, I don't have any disputes with you. At the very same time, St. Anthony is telling the federal court has all sorts of disputes. So we got caught in running around in circles. How can we resolve disputes in a situation when St. Anthony is saying there are no disputes with the MCO? That's really the fulcrum problem here. The question we all are thinking about here, is there a systemic problem? The MCOs say no. And in fact, the arbitrations, we believe, will demonstrate that. I think there's three things we all do agree on. Maybe this is a good place to start. First, we know the parties agree that the factual predicate for this dispute all comes down to whether the MCOs are timely paying claims. And in fact, St. Anthony concedes that point on pages 26 to 27 of its reply brief. Second, we all agree that the source of these payment obligations is the MCO contracts. Third, we all agree that even— are supposed to comply with the Medicaid law. Exactly. And in fact, those provisions are baked right into the contract, which just shows the connectedness between the issue and the arbitration provisions that we're all here talking about. And to be clear, all four of the MCOs have arbitration provisions. Three of them are mandatory. So I don't want the record to be confused on that point at all. But I think the third point we all agree on is that these MCO contracts do contain these arbitration provisions. Nobody disputes that. These three agreed points lead to, I think, one overarching takeaway. And that is that there is an existing structure for resolving disputes like this one, and that's arbitration. And St. Anthony agreed to it. So when there's an agreed mechanism like there is here, you can't just forgo that and run instead and burden the federal court and say, here I am. But that's exactly what St. Anthony has done here. Now, we've explained to the court there's a two-step process. And I think this first step of the process is incredibly important. Step one, the arbitrators need to do some heavy lifting. They need to evaluate, really, a host of micro details. And micro details is probably the right word there. Can I cut through? I mean, we're running short on time. But I've picked up, anyway, from your brief that there may be some idea that there need to be a certain number of arbitrations before somebody can come into court and say that the arbitral mechanism is broken and we don't have that predicate yet. Did you say that? We are saying that you have to have a factual predicate. And the only place you can get that factual predicate is in arbitration, because that's what the parties have agreed to. OK. Well, actually, I would like you to wrap up. And then I'm going to give Mr. Feldman the three minutes he wanted for rebuttal. OK. Thank you, your honors. I just wanted to conclude by saying arbitration is the right first step here. And we respectfully request that the court uphold the district court's ruling. Thank you. Thank you. Mr. Feldman. Thank you very much. I want to first correct two misstatements. One by me in my opening argument, and then one by Mr. Hazard. The one by me, smarter people than I have informed me, while the other council were arguing, that I had the timeline wrong when I was talking about the timeline that the state was measuring from the MCO's performance on payments. They actually measure from the time of submission to the time of adjudication. I moved the timeline in a different direction. So they do track time of submission to time of adjudication, but not time of payment. And time of payment is obviously the critical part of the statute. They can adjudicate, but if they don't issue the check the same day or electronic transfer the same day, then the state is not capturing the actual timeline. And even under that truncated timeline, they're not hitting the requirement. The misstatement by Mr. Hazard is that we somehow abandoned Section 37A. And Judge Wood, I'm abandoning all of the letters and numbers before the 37A. Thank you, I appreciate that. The 37A is incorporated in U2F. So our claim is based on the conjoined U2F and 37A. And to Judge Hamilton's question, 37A and U2F are concerned about a lot more than paper. U2F was not a dictation mechanism. It was not Congress giving the state a template and saying, if you just put this template in the contract, that's all you have to do. There's also contractual obligations. And you still have, this is to one of Judge Wood's questions, you still have a state plan. 37A is still part of the state plan. And you states still have obligations. But what do you say to this? I mean, one of the things that worries me that I think I at least inferred from Mr. Huzzag's brief and or argument, you know, suppose an MCO isn't paying as quickly as is stipulated in this. But the recipient, but they're a very important MCO for an institution such as St. Anthony. We don't want to just cut it off. I mean, it's a funding clause statute. The state could cut it off and stop paying it. But the state might well take the position. That would be so harmful to the patients who receive their medical services at St. Anthony. We're going to exercise our enforcement discretion and try to, you know, work it out. We're going to overlook this one or try to resolve it in a less contentious manner than this ironclad requirement that you seem to be asking for. So the state is, I think they're taking the position they need that, if you will, prosecutorial discretion. I think that the answer to that question is, I think the answer that Judge Hamilton or question Judge Hamilton asked about OB versus Norwood. The state does have discretion. Clearly, they have discretion. And in the first instance, when a federal court finds that there's a duty that's been violated, and if it's a state that is violating the duty, typically they do what we're asking here. All right, state. And what happened in OB versus Norwood? Okay, state, come up with your plan for how you're going to fix this problem. What are you going to do to get this particular problem MCO or the MCOs generally to come up with, as 37A says, the claim claim payment procedures that ensure payment on the 3090 day timeline. So and then the court, there'd be due process and the court can evaluate whether the procedures are adequate. But Mr. Feldman, can that reading that argument you've been offered, can that be read in harmony with this 1396 UTE talk about the states having discretion to terminate contracts with the noncompliant MCOs? Can those two things be read in harmony? Sure. I mean, termination, we could call it the MCO death penalty, if you will. That would be an absolute last resort, if necessary. And we did have in our complaint, you know, if there is a last resort, we want you to take it over. But that was, I doubt we would ever have to get there. That would have to be a truly egregious situation. So I think they are in harmony there. There is that possibility of a final draconian remedy. But that's unlikely. The state ought to be able to fix that without going that far. I just want to make one point about complication. I'm sorry. But before we lose you on Rule 15, in your principal argument, you were making reference to the fact that you were making a choice between 15D and 15A. And this may have implication for our case law, the Glatt case, et cetera. Could you finish that response with regard to why 15D was chosen versus 15A? Sure. And I think the label has taken on more meaning than it should. Because the bottom line is, as Judge Wood was asking earlier, it's just a new legal theory for a set of facts. We had both old facts and previously pleaded facts and new facts. 15A talks about what existed at the time the case was filed. 15D talks about facts that arise afterward. We had both. We didn't know, should we call it amendment? Should we call it supplement? We chose supplement. If the court prefers that we call an amendment, we'll put that label on it. I don't think it's a substantive question. One final point, if I may, on complication. Mr. Whitmer talked about how complicated things are. That's the heart of our transparency argument. It is complicated. They're running numbers, and we don't know how they're coming up with the final number that they're paying us. So all we want is for those particular items, the add-ons, the adjusters, the half payment amounts that are embedded in the payment, put it in the remittance or give us some other form. We want the information. The form that comes to us is not as critical. Give us the information in a timely way so we can figure out if we're getting paid. We can figure out if you've done the math correctly, and then we can pursue a remedy if we think we're being underpaid. Thank you for your time. We ask that the court reverse and with instructions to allow count three to proceed. Thank you. All right. Our thanks to all counsel. We'll take the case under advisement.